Jennifer S. Dempsey (ISB No. 7603)
jsdempsey@bdfcounsel.com
Alyson A. Foster (ISB No. 9719)
afoster@bdfcounsel.com
Taylor J. Long (ISB No. 11966)
tlong@bdfcounsel.com
**BJORKMAN DEMPSEY FOSTER PLLC**
714 West State Street
Boise, ID 83702
Telephone: (208) 401-9533
Fax: (855) 940-1879

*Attorneys for Plaintiff Laura Rumpler*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| LAURA RUMPLER,<br><br>                    Plaintiff,<br><br>v.<br><br>NORTH IDAHO COLLEGE, an Idaho public corporation; TARIE ZIMMERMAN, BRAD CORKILL MIKE WAGGONER, TODD BANDUCCI, and GREG MCKENZIE, in their official capacities as members of the BOARD OF TRUSTEES OF NORTH IDAHO COLLEGE; and DOE DEFENDANTS 1-100,<br><br>                    Defendants. | Case No.<br><br>**COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Laura Rumpler ("Rumpler" or "Plaintiff"), by and through her undersigned

counsel of record, Bjorkman Dempsey Foster PLLC, complains against Defendant North Idaho

College and its Trustees: Tarie Zimmerman, Brad Corkill, Mike Waggoner, Todd Banducci, and

Greg McKenzie, as follows:

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL

## I.    NATURE OF ACTION

1.      This lawsuit arises out of the toxic, retaliatory, and harassing conduct at NIC caused by NIC, its Board of Trustees, and its President, which created an unsafe and untenable workplace for its longstanding Chief Communications and Government Relationship Officer, Plaintiff Laura Rumpler. This toxic, retaliatory, and harassing conduct escalated in such a manner that Ms. Rumpler had no choice but to pursue a grievance. Following her filing of the grievance, the retaliatory and harassing conduct escalated such that Rumpler was subject to on-campus and community-wide attacks, both personally and professionally, that were disparaging and harmful, causing Ms. Rumpler to be fearful for her physical safety and that of her family. Ultimately, Ms. Rumpler had no choice but to resign while the investigation of her grievance continued. Since her wrongful discharge, NIC and its Board of Trustees have consistently and steadfastly refused to address Ms. Rumpler's grievance in any fashion, depriving Ms. Rumpler of her due process rights under the law.

## PARTIES, VENUE, AND JURISDICTION

2.      Laura Rumpler ("Rumpler") is a resident of Spokane County, Washington, and is a former employee of North Idaho College.

3.      Defendant North Idaho College ("NIC") is a duly formed and existing community college in the state of Idaho and having its principal place of operation in Kootenai County, Idaho, and which may be sued in its own name pursuant to Idaho Code §33-2108.

4.      Defendant Board of Trustees of NIC ("Board") is the governing body of NIC pursuant to Idaho Code §33-2107.

5.      Defendants Tarie Zimmerman, Brad Corkill, Mike Waggoner, Todd Banducci, and Greg McKenzie are the current members of the Board of Trustees and are being claimed against in their official capacities (collectively "Trustees").

6.      The fictitiously named DOES 1-100 are individuals and entities who, on information and belief and at all relevant times, acted jointly with all other Defendants under color of state law, and have committed acts or omissions, or have caused events to occur, that have resulted in damages to Rumpler. If and when the identities of those individuals and entities are discovered, this Complaint shall be amended accordingly.

7.      Throughout this Complaint, unless otherwise noted, all Defendants identified in this Complaint are collectively "Defendants."

8.      This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C §1331 and 42 U.S.C §1983. This Court has supplemental jurisdiction over her claims arising under the laws of the State of Idaho pursuant to 28 U.S.C. §1367. This Court also has diversity jurisdiction over all Plaintiff's claims pursuant to 28 U.S.C. § 1332(a)(1) because (i) the parties are diverse: Plaintiff is a resident of and domiciled in Washington, North Idaho College is a public corporation located in Idaho and organized under the laws of Idaho, and each of its Trustees is a resident of and domiciled in Idaho; and (ii) the amount in controversy exceeds $75,000, exclusive of interest and costs, because Rumpler seeks back pay, benefits, and other monetary damages that total more than $141,000.00.

9.      Because the events, acts and omission giving rise to this Complaint occurred within the state of Idaho, venue is appropriate in this Court pursuant to 28 U.S.C. §1391.

## II.    FACTUAL BACKGROUND

### Rumpler's Position with NIC

10.     Rumpler was NIC's Chief Communications and Government Relationship Officer from January 2017 until August 29, 2023. On August 29, 2023, NIC wrongfully discharged her. Rumpler had worked in the public sector of public education in Idaho in various capacities for nearly fourteen (14) years.

11.     During her tenure at NIC, Rumpler was an active and valued member of the President's Cabinet for NIC, reporting directly to the president of the college. As NIC's Chief Communications and Government Relationship Officer, Rumpler was responsible for providing stewardship of the college's community relations, local/state/federal governmental relations, media relations, marketing, internal and external stakeholder communications, and public affairs. Throughout her NIC tenure, Rumpler served as the strategic advisor to NIC's presidents, the board of trustees, and other campus leaders with respect to communications, legislative affairs, crisis situations, and public relations. During her tenure, Rumpler also worked closely and directly with NIC's president regarding government and community relationships, serving as the president's and college's spokesperson for external relations with the media, community partners, and college stakeholders.

12.     Ms. Rumpler worked under a total of five (5) presidents (two permanent, one acting and two interim) during her time at NIC. Four of the five presidents were in the last twenty (20) months of her employ.

13.     On April 30, 2022, NIC offered Rumpler a new two-year contract ("Employment Contract").

14.     Rumpler's Employment Contract confirmed her strategic value to NIC:

"[Rumpler is] an exemplary employee having served in C-suite leadership role since January

2017" and she "has valuable experience, ethics, achievement, and skillset that are highly desired and recruitable."

     15.    Rumpler's Employment Contract also expressly acknowledged issues with NIC's accreditation and Rumpler's material role in ensuring continued accreditation:

> During this period of significant change at the senior leadership level and the Northwest Commission of Colleges and Universities' (NWCCU) recommendation for consistency and stability in leadership at the college, it is in the best interest of NIC to retain [Rumpler].

     16.    Finally, the Employment Contract required NIC to execute a reclassification process "as [Rumpler] has been performing duties (within their current role) that align with the level of responsibility, autonomy, decision-making, skillset and representation of an associate vice president or vice president."

     17.    Based on the clear terms of Rumpler's Employment Contract, starting July 1, 2023 (unless earlier due to reclassification), Rumpler was scheduled to move from a P 13 pay grade to a higher corresponding pay grade of an associate vice president or vice president.

### Obligations of NIC's Board and its Trustees

     18.    NIC promulgates policies and procedures for its Board and Trustees. NIC's Board policies and procedures purport to reflect those obligations under Idaho law and are intended, in part, to ensure NIC's staff, faculty, students and visitors are treated fairly and ethically in their relationships and engagements with the Board and receive due process.

     19.    NIC's Board policies and procedures articulate standards and requirements with respect to a Board member's general conduct providing "[t]hat its behavior, and that of its members, exemplifies the principles of ethical behavior and conduct that is above reproach" and

"[i]t endeavors to remain always accountable to the community." ("NIC Board's Standards of Good Practice") *See,* NIC Policy 2.01.02, Section III.

20.    At Section II, NIC Board's Standards of Good Practice state its purpose: "to prescribe processes, behaviors, and methods of appropriate communications for effective and efficient Board operations."

21.    At Section III, NIC Board's Standards of Good Practice delineate the General Guidelines for Board conduct:

> The Board expects its members to demonstrate ethical and businesslike conduct. This commitment includes the proper use of authority and respect in group and individual behavior when acting as Board members.
>
> Board Members are expected to:
>
> …
>
> 2.    Consider information received from all sources and base personal decision upon all available facts while maintaining confidentiality of privileged information.
>
> …
>
> 8.    Demonstrate discretion when making public statements in person, online, or in other forums, so as to minimize the impression that such statements reflect the opinion of NIC or the Board when they do not.
>
> 9.    Maintain the highest standards of civility and respect accorded to public office through the absence of unwarranted criticism of fellow Board members, the Board, NIC administration or employees.
>
> 10.    Deal appropriately with sensitive issues and respect the confidentiality of discussions that take place during executive sessions.
>
> 11.    Represent everyone the College serves, not a particular interest group.

22.     Idaho Code §74-206(1)(b) and NIC Board Policy 2.01.03 require that NIC's Board, and each of its Trustees, go into executive session to consider issues pertaining to a grievance or personnel matter raised by an NIC faculty or staff member so that the Board and its Trustees can properly perform their duties and functions and preserve the confidentiality of the grievance or personnel matter as required by Idaho law.

23.     Idaho Code §74-206(1) provides that "[a]n executive session shall be authorized a two-thirds (2/3) vote of the governing body." Section 74-206(1) also provides that a roll call vote shall be made, and the vote shall be recorded in the minutes.

24.     NIC's Board has five trustees. Thus, to go into executive session, at least four Trustees must vote in favor of the executive session.

25.     If the Trustees fail or otherwise refuse to go into executive session when a personnel matter or grievance must be addressed, they deprive NIC faculty and staff who raise personnel matters or file a grievance due process under the law. And, if they consider any aspect of the personal matter or grievance in open session, they risk unlawful public disclosure of private and confidential personnel information.

### NIC's Accreditation Issues

26.     All public colleges, including NIC, are accredited through an organization approved by the United States Department of Education. NWCCU is one such organization that is recognized by the Department of Education as an accreditor of higher education institutions in the United States.

27.     Accreditation by an organization like NWCCU is critically important to NIC as it ensures that NIC continues to receive funding and that academic credits/degrees obtained from NIC are recognized and transferred to other institutions.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL - 7

28.     On April 1, 2022, NWCCU issued NIC an official warning to correct certain deficiencies, to refrain from certain activities, and/or to initiate certain activities within a certain time period. In its April 2022, Sanction of Warning, NWCCU advised that NIC's accreditation would be under investigation for a three-year period.

29.     On February 9, 2023, NWCCU issued NIC a Sanction of Show Cause based, in part, on the following: "three lawsuits, one settled and two active," "frequent changes in leadership with little to no input from relevant stakeholders, without following institutional policies and procedures," "[u]ncertainty as to who is the Chief Executive Officer at [NIC]", and "[c]ontinued exodus of faculty, staff, and senior administrators." ("NWCCU 2/9/23 Show Cause Sanction")

30.     NWCCU's 2/9/23 Show Cause Sanction stated that its Commission was "[c]onvinced that the NIC Board of Trustees has not shown sufficient responsiveness to previous Commission action and, thus, fails to sufficiently appreciate the jeopardy it is placing the institution in with respect to the welfare and viability of the institution."

31.     In correspondence dated July 7, 2023 ("NWCCU 7/7/23 Letter"), NWCCU continued its Show Cause Sanction, citing nine "Recommendations" for which NIC remained out of compliance. These "Recommendations" included, but were not limited to:

> Recommendation 1: Spring 2023 Special Report - The Board and College President should continue training and development activities to improve governance, ensure that policies on ethics and general conduct are followed, and demonstrate a sustained commitment to the requirements and standards of NWCCU member institutions manifested through concrete actions over time.

> Recommendation 3: Spring 2023 Special Report - The college and its Board must take action to resolve the uncertainties regarding both the leadership and accreditation status of the institution in order to improve retention of existing employees and fill current vacancies.

Recommendation 7: Spring 2023 Special Report - The Board and College President should ensure that they adhere to the inclusivity articulated in the college's planning and decision-making processes. The Board and College President should demonstrate a commitment to an environment respectful of meaningful discourse, in their official capacities and when interacting with each other.

Recommendation 11: Spring 2023 Special Report – The college should resolve current litigation, governance, and accreditation issues that have had a current and immediate impact on actual, current, and budgeted expenditures and which, if unresolved, will impact long-term financial stability of the institution.

32.    From October 30, 2023, through November 1, 2023, a peer review team selected by NWCCU conducted a site visit of NIC. In their Ad-Hoc/Special Evaluation Peer-Evaluation Report ("Peer Evaluation Report"), NWCCU said, while it was "impressed with the dedication and resilience of NIC's administration, faculty, staff, and students," they remained concerned with "the Board's behavior and action."

33.    In particular, the Peer Evaluation Report stated that the Board had failed to adhere to their own policies. Citing to NIC's Board Standards of Good Practice (NIC Policy 2.01.10), the Peer Evaluation Report stated:

Based on observed Board meetings, the evaluation team concurs with comments made by campus constituencies, that while Board conduct during its meetings may have marginally improved, there are still instances where the Board violates this policy, showing lack of respect for other Board members as well as campus community members, a lack of decorum, and a lack of confidentiality with sensitive information.

### **Rumpler's Grievance**

34.    NIC Policy and Procedure 3.02.23 sets forth NIC's grievance policy and procedure to ensure an NIC employee be treated fairly and receive due process with respect to disputes that an employee has with NIC.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL - 9

35.     NWCCU accreditation standards are in accord with NIC's grievance policy and procedure: "The institution ensures that complaints and grievances are addressed in a fair, equitable, and timely manner." NWCCU Accreditation Standard 2.D.2.

36.     On June 7, 2023, Rumpler submitted a grievance to NIC regarding a confidential personnel matter that involved President Swayne and then Chief Human Resources Officer Karen Hubbard ("Rumpler's Grievance"). Without disclosing Rumpler's private and confidential personnel information, Rumpler claimed President Swayne and Chief Human Resources Office Karen Hubbard engaged in tortious, harassing, and retaliatory conduct when she participated in the defense of a lawsuit President Swayne had brought against NIC regarding the Board's decision to place him on administrative leave ("Swayne's Lawsuit").

37.     Because NIC's procedure states that "the decision of the president is final and exhausts internal college remedies for the grievant," and her Grievance was against President Swayne, Rumpler submitted her Grievance directly to the Board of Trustees and the college's Legal Counsel. In her Grievance, Rumpler indicated a desire to resolve her claim in a reasonable manner that would not impact NIC's accreditation issues.

38.     The Board voted to hire, and hired, an investigator to undertake an investigation of Rumpler's Grievance.

**NIC Refused to Reclassify Rumpler Pursuant to Her Written Contract**

39.     Simultaneous to the investigation of Rumpler's Grievance, Rumpler learned that, notwithstanding that her Employment Contract required NIC to reclassify her position and increase her salary on or before July 1, 2023, NIC had never done so and had no intention of ever doing so.

40.     NIC's Chief Human Resources Officer, Karen Hubbard, made it clear that she did not like Rumpler's "special" contract and outright refused to reclassify Ms. Rumpler to an Associate Vice President or Vice President level, including the corresponding pay grade change. In fact, Ms. Hubbard confirmed to a reporter for the Coeur d'Alene Press on July 17, 2023, that NIC was not going to reclassify Ms. Rumpler, in direct violation of Rumpler's Employment Contract.

41.     On information and belief, NIC, in particular, NIC's Chief Human Resources Officer, Karen Hubbard, refused to reclassify Rumpler (as required by Rumpler's Employment Contract) in retaliation for Rumpler's participation in the defense of Swayne's Lawsuit and her ill-informed perception that Rumpler did not support President Swayne. At no point did Rumpler ever choose sides in the political warfare between President Swayne and certain trustees. In fact, Rumpler had always only endeavored to serve NIC by doing her job well.

42.     At no time did NIC, President Swayne, Karen Hubbard, the Board, or its Trustees provide Rumpler notice and opportunity to be heard regarding their deprivation of her rights under her Employment Contract.

### NIC's Investigation and the Confidential Report

43.     The investigation of Rumpler's Grievance took nearly five months. On October 13, 2023, the investigator issued a confidential report regarding Rumpler's Grievance ("Confidential Report").

44.     Even though the Confidential Report directly pertained to Rumpler's Grievance, NIC and the Board refused to provide a copy of the report to her. In fact, NIC only provided the report to Rumpler in January 2024 after President Swayne obtained a court order that NIC must

provide a redacted version to him because certain portions of the Confidential Report pertained to him.

45.     Rumpler's Grievance, and all information and documents pertaining to it including the Confidential Report, are private, confidential, and exempt from disclosure as a public record under Idaho Code §74-106(1). Rumpler has consistently maintained that these materials are private, confidential, and exempt from public disclosure both before and after June 7, 2023, the date she filed her Grievance.

46.     Idaho Code §74-106(1) states:

> The **following records are exempt from disclosure**:
>
> (1)     Except as provided in this subsection, **all personnel records of a current or former public official** other than the public official's public service or employment history, classification, pay grade and step, longevity, gross salary and salary history, including bonuses, severance packages, other compensation or vouchered and unvouchered expenses for which reimbursement was paid, status, workplace and employing agency. **All other personnel information relating to a public employee or applicant including, but not limited to,** information regarding sex, race, marital status, birth date, home address and telephone number, social security number, driver's license number, applications, testing and scoring materials, **grievances, correspondence and performance evaluations, shall not be disclosed to the public without the employee's or applicant's written consent**.

Idaho Code §74-106(1) (emphasis added).

47.     NIC Policy No. 3.11 is in accord. NIC Policy 3.11 states "[i]t is the policy of North Idaho College to maintain the confidentiality of personal information such as employment information… to the extent allowed by public information laws."

48.     At all relevant times, Rumpler has never consented, and always stated that she does not consent, to disclosure of any of her personnel information, including that pertaining to her Grievance and the Confidential Report.

49.     At the beginning of the Confidential Report, the investigator identified the toxic, harmful, and retaliatory environment at NIC that was entirely unrelated to the personnel claims raised by Rumpler in her Grievance, echoing NWCCU's concerns raised in its accreditation process.

50.     As NWCCU found in its 2/9/23 Show Cause Sanction and 7/7/23 Letter, the investigator found there was a toxic climate at NIC arising from the Board's dynamics, Swayne's Lawsuit, the Court's ultimate decision to reinstate President Swayne, and unlawful disclosures by certain trustees. The investigator concluded that this toxicity led to the scope of the investigation expanding well beyond the claims asserted in Rumpler's Grievance. The investigator also concluded this toxic environment led to witnesses being fearful, in particular fearful of retaliation by Board, which in turn chilled these witnesses' willingness to participate in the investigation,

50.     Rumpler understood this fear, as she had been subject to on-campus and community-wide attacks, both personally and professionally, that were disparaging and harmful, some actions crossing the line to threatening behavior causing Rumpler to be fearful for her physical safety and that of her family so much so that NIC worked with Rumpler on a safety plan for when she physically came to campus.

51.     The toxic climate at NIC, the scope creep of the investigation, and the chilling of witnesses' speech deprived Rumpler of right to a fair, unbiased, and complete investigation.

## **Rumpler's Wrongful Termination through Constructive Discharge**

52.     Because of the continued retaliation by President Swayne and Chief Human Resources Officer Hubbard and the significant safety risks to which she was exposed, Rumpler's working conditions had deteriorated to the point that she was unable to perform the essential functions of her job. While Rumpler endeavored to continue her work to support NIC as it navigated its accreditation and other issues, for her own personal and professional safety and wellbeing, she had no choice but to resign and did so on August 25, 2023. Pursuant to the Employment Contract, Ms. Rumpler assumed she was required to provide the minimum two weeks' notice and did so, even though her working conditions were intolerable and unsafe. It was important to Rumpler that she do all she could to transition her team and finish her work. However, on or around August 29, 2023, without notice to Rumpler, President Swayne directed the cutting off of access to Rumpler on NIC working folders and accounts that she had access to for nearly seven years, leaving her unable to transition her team or finish her work.

## **Trustee Zimmerman's Disclosure of Rumpler's Confidential Information**

51.     On August 30, 2023, the Coeur d'Alene Press published an article stating that NIC had confirmed that Rumpler provided notice of her resignation, and that "[m]ultiple sources have indicated to The Press that the personnel matter under [NIC counsel's] purview is related to Rumpler and may involve allegations of retaliation against her by Swayne."

52.     That same day, NIC noticed a Board of Trustee special meeting for August 31, 2023, with the following agenda items: an executive session under Idaho Code §74-206(1)(b)(f) to be followed by a special open meeting regarding "new business related to executive session" to "respond to personnel matter."

53.     Prior to the August 31, 2023, special meeting, President Swayne sent an email to all college stakeholders stating that he had received word from NIC attorney Art Macomber that Rumpler had given notice of resignation on Monday, August 28, 2023 and that her last day with the college would be September 8, 2023.

54.     Even though Trustee Zimmerman knew, or should have known, that she was required to keep private personnel information learned during executive session confidential, during the August 31, 2023, open meeting that immediately followed the executive session, she made the following disclosures of Rumpler's confidential employee and personal information:

    a.  that the personnel matter at issue was about an "employee" who had made "allegations" and "claims" against NIC that are under investigation; and

    b.  that "[t]hese claims by this person are unfounded and I think that when we get the results back from the investigation, they probably will be proven they're unfounded."

(*https://www.youtube.com/watch?v=5ke9iD8vNXs* last accessed 2/9/24)

55.     While Trustee Zimmerman may not have identified Rumpler by name during the August 31, 2023, special meeting, based on President Swayne's email sent out earlier on the same date and the prior day's Coeur d'Alene Press article about Rumpler, she knew the public would easily and readily make the connection that her unlawful disclosures pertained to Rumpler.

56.     Trustee Zimmerman also knew that the investigation regarding Rumpler's Grievance was ongoing, and that no determination had been made when she made her biased and inflammatory statement that the "claims by this person are unfounded." This disclosure was intended to disparage and cause personal and professional harm to Rumpler.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL - 15

57.     Trustee Zimmerman even knew that she should not have disclosed any information learned during the executive session, but then disclosed it anyway. Specifically, Trustee Zimmerman stated: "Does anybody want to open their bank account? I think the sum— can I say the sum?" The audience proclaimed: "Yeah.," Trustee Zimmerman then disclosed the specific monetary sum Rumpler sought in her confidential grievance and told the audience: "That's on the taxpayer's back."

58.     Finally, Trustee Zimmerman vowed that the Board's consideration of the Rumpler Grievance would not happen in executive session. In response to then Chair McKenzie's statement that certain issues would be discussed in executive session, Trustee Zimmerman stated: "it's not going to happen." *Id.*

## Since August 31, 2023, Trustees Zimmerman and Corkill Have Continued to Deprive Rumpler Due Process Under the Law

59.     NIC's Board has regular monthly meetings. Since August 31, 2023, three out of the five Trustees have attempted to go into executive session to properly address Rumpler's Grievance. However, as she promised during the August 31, 2023, special meeting, Trustee Zimmerman has outright refused to go into executive session, evidencing her clear and unfair bias against Rumpler and Rumpler's Grievance. Trustee Corkill has also refused to vote to go into executive session.

60.     On information and belief, given their close alliance, Trustee Corkill also has a clear and unfair bias against Rumpler and Rumpler's Grievance. On information and belief, Trustees Zimmerman and Corkill are conspiring against Rumpler and any attempt by Rumpler to resolve her Grievance in a reasonable manner (as Rumpler had earlier expressed) so that it would not impact NIC's accreditation issues.

61.     On information and belief, Trustee Zimmerman and Corkill have conspired to prevent the proper consideration of Rumpler's Grievance and deprived her due process under the law. Their conduct has left Rumpler with no choice but to pursue a lawsuit against NIC, the Board, and its Trustees in order to receive due process under the law.

62.     Since June 7, 2023, and continuing to the present time, Rumpler has suffered from physical and emotional distress, fear for her and her family's personal safety, pain and suffering, and damage to Rumpler's good professional name and standing as a result of all Defendants' actions described herein.

63.     While Rumpler has been able to secure new employment, such employment is in another state that requires her to be away from her family. The overall compensation and benefits of her new employment are less than what she earned when employed by NIC and even much less than what she should have been paid pursuant to her Employment Contract. Rumpler also had to leave the Idaho Public Employee Retirement System (PERS) after nearly fourteen years in the system.

64.     On February 21, 2024, Rumpler timely filed a Notice of Tort claim with the chair, the secretary of the Board, and the attorney for NIC, care of the attorney for NIC, pursuant to Idaho Code §6-906. In the event NIC and/or the Board deny Rumpler's claim or fail to approve or deny Rumpler's claim at the end of ninety (90) days, Rumpler shall seek leave to amend the Complaint to add her tort claims for recovery against Defendants.

## **CLAIMS FOR RELIEF**

### **FIRST CLAIM FOR RELIEF**
**Due Process Violation – 42 U.S.C. §1983**
**Fourteenth Amendment to the United State Constitution**

65.     Rumpler re-alleges the allegations in each paragraph above and incorporates them herein by reference as though set forth in full.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL
- 17

66.    Both NIC's and NWCCU's policies regarding the handling of grievances provided Rumpler a right to a fair, unbiased, and complete investigation of her Grievance.

67.    Rumpler, pursuant to her contract of employment, also had a reasonable expectation of continued employment and a property right in continued employment protected by the due process clause of the Fourteenth Amendment to the United States Constitution.

68.    Rumpler also possessed a liberty interest in her good professional name and standing.

69.    Because, acting under color of state law, NIC, the Board, and the Trustees created a toxic environment where witnesses to Rumpler's Grievance were afraid to come forward and were otherwise fearful of retaliation, Rumpler has been denied her right to due process of law prior to the deprivation of her property and liberty interests.

70.    Because Trustees Zimmerman and Corkill, acting under color of state law, prejudged Rumpler's Grievance, maintained a clear bias against Rumpler and her Grievance, and have refused to vote to go into executive session regarding Rumpler's Grievance on no less than five (5) occasions, Rumpler has been denied her right to due process of law prior to the deprivation of her property and liberty interests.

71.    Because, acting under color of state law, NIC and the Trustees failed to take any action with respect to the expressed and outright refusal of Trustees Zimmerman and Corkill to go into executive session, Rumpler has been denied her right to due process of law prior to the deprivation of her property and liberty interests.

72.    Because, acting under color of state law, NIC refused and/or otherwise failed to reclassify Rumpler without any notice or opportunity to be heard, Rumpler has been denied her right to due process of law prior to the deprivation of her property and liberty interests.

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL
- 18

73.     Because, acting under color of state law, NIC and its Trustees permitted, contributed, or otherwise allowed the intolerable working conditions which led directly to Rumpler's resignation, Rumpler has been denied her right to due process of law prior to the deprivation of her property and liberty interests.

74.     Unless the Trustees are ordered to go into executive session to appropriately consider Rumpler's Grievance, Rumpler's denial of due process of law will continue, harming and deterring Rumpler and other NIC employees, faculty and staff from pursuing grievances or related personnel matters without due process of law.

75.     As a direct and proximate result thereof, Rumpler has suffered damages including lost wages of at least $141,822.77 and benefits, damage to her personal and professional reputation, and emotional distress, in an amount to be proven at trial but no less than seventy-five thousand dollars ($75,000).

76.     Rumpler is entitled to all legal and equitable remedies available for violation of her due process rights, including compensatory damages, injunctive relief, attorneys' fees and costs, and other appropriate relief.

### SECOND CLAIM FOR RELIEF
### Due Process Violation
### Article I, Section 13 of the Idaho Constitution

77.     Rumpler re-alleges the allegations in each paragraph above and incorporates them herein by reference as though set forth in full.

78.     By engaging in the conduct alleged in Rumpler's First Claim for Relief, NIC and its Trustees violated Rumpler's right to procedural due process guaranteed by Article I, Section 13 of the Idaho Constitution.

79.     Unless the Trustees are ordered to go into executive session to appropriately consider Rumpler's Grievance, Rumpler's denial of due process of law will continue, harming and deterring Rumpler and other NIC employees, faculty and staff from pursuing grievances or related personnel matters without due process of law.

80.     As a direct and proximate result thereof, Rumpler has suffered damages including lost wages of at least $141,822.77 and benefits, damage to her personal and professional reputation, and emotional distress, in an amount to be proven at trial but no less than seventy-five thousand dollars ($75,000).

81.     Rumpler is entitled to all legal and equitable remedies available for violation of her due process rights, including compensatory damages, injunctive relief, attorneys' fees and costs, and other appropriate relief.

### THIRD CLAIM FOR RELIEF
### Breach of Contract

82.     Rumpler re-alleges the allegations in each paragraph above and incorporates them herein by reference as though set forth in full.

83.     Rumpler fully performed all obligations required of her under her Employment Contract, except as may have been waived, excused and/or prevented by the acts of Defendants.

84.     Defendants breached Rumpler's Employment Contract by, among other things, failing to reclassify her, failing to increase her pay grade, and constructively discharging her prior to the end of the Employment Contract.

85.     As a direct and proximate result thereof, Rumpler has suffered damages including lost wages of at least $141,822.77 and benefits, damage to her personal and professional reputation, and emotional distress, in an amount to be proven at trial but no less than seventy-five thousand dollars ($75,000).

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL
- 20

## FOURTH CLAIM FOR RELIEF
### Breach of the Implied Covenant of Good Faith and Fair Dealing

86.    Rumpler re-alleges the allegations in each paragraph above and incorporates them herein by reference as though set forth in full.

87.    The duty of good faith and fair dealing inheres in Rumpler's Employment Contract between Rumpler and NIC.

88.    Defendants breached their duty to act in good faith and to deal fairly under Rumpler's Employment Agreement by, among other things, failing to reclassify her, failing to increase her pay grade, and constructively discharging her prior to the end of the Employment Contract. By doing so, Defendants violated, nullified, and significantly impaired the benefits to Rumpler of the Employment Contract.

89.    As a direct and proximate result thereof, Rumpler has suffered damages including lost wages of at least $141,822.77 and benefits, damage to her personal and professional reputation, and emotional distress, in an amount to be proven at trial but no less than seventy-five thousand dollars ($75,000).

## FIFTH CLAIM FOR RELIEF
### Violation of the Idaho Protection of Public Employees Act

90.    Rumpler re-alleges the allegations in each paragraph above and incorporates them herein by reference as though set forth in full.

91.    Each of the Defendants is an "Employer" under the Idaho Protection of Public Employees Act pursuant to Idaho Code §6-2103(a) or (b).

92.    As alleged above, Rumpler engaged in protected activity under Idaho Code §6-2104(1)-(3) when she: 1) participated in the defense of Swayne's lawsuit by communicating in good faith what she understood to be Swayne's violation or suspected violation of law, rule, or regulation; (2) participated in an investigation regarding Rumpler's Grievance; and (3) objected

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL - 21

to and/or refused to carry out directives issued by President Swayne that she reasonably believed violated law or rule of regulation.

93.    As a result of Rumpler's protected activity, Defendants took adverse actions against her including, among other things, subjecting her to intolerable working conditions, chilling witnesses' participation in the investigation of Rumpler's Grievance, and eventually constructively discharging her employment, all in violation of Idaho Code §6-2104.

94.    As a direct and proximate result of Defendants' retaliation, Rumpler has suffered damages including lost wages of at least $141,822.77 and benefits, damage to her personal and professional reputation, and emotional distress, as well as attorneys' fees and court costs, in an amount to be proven at trial but no less than seventy-five thousand dollars ($75,000).

## DEMAND FOR JURY TRIAL

95.    Rumpler hereby demands a jury trial pursuant to Rule 38 of the Federal Rules of Civil Procedure.

## COSTS AND ATTORNEY'S FEES

96.    Rumpler has been required to obtain the assistance of counsel to assist in the prosecution of this matter. Plaintiff is entitled to recover her reasonable costs and attorney's fees incurred in the prosecution of this matter pursuant, but not limited, to 42 U.S.C. § 1988, Rule 54 of the Federal Rules of Civil Procedure, Idaho Code §§ 6-2105, 12-117, 12-120, and 12-121 and other applicable law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants as follows:

1.    Injunctive relief requiring the Trustees to go into executive session to consider Rumpler's Grievance;

2.    Damages in an amount to be determined at trial, including without limitation back pay and benefits, including accrued vacation and sick pay balances in amounts to be determined at trial;

3.    Compensatory and consequential damages;

4.    Punitive damages as allowable;

5.    Pre-judgment and post-judgment interest at the highest lawful rate;

6.    Attorneys' fees and costs of this action, including expert witness fees, as appropriate; and,

7.    Any such further relief as justice allows.

DATED this 21st day of February, 2024.

BJORKMAN DEMPSEY FOSTER PLLC


 /s/ *Jennifer Schrack Dempsey*
 Jennifer Schrack Dempsey

*Attorneys for Plaintiff Laura Rumpler*

COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF; DEMAND FOR JURY TRIAL - 23